**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**Indianapolis Division**

| | | |
|---|---|---|
| **RODERICK CONVERSE** and **PATRICIA GRUESSER**, | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | **Case No. 1:19-cv-4872** |
| **PHH MORTGAGE CORPORATION**, successor by merger with OCWEN LOAN SERVICING, LLC., and **US BANK N.A.**, as Trustee for RAMP 006EFC2, | ) ) ) ) ) | |
| *Defendants.* | ) ) ) ) | |

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Roderick Converse ("Converse") and Patricia Gruesser ("Gruesser") (collectively referred to hereinafter as "Plaintiffs"), by counsel, complain of Defendants, PHH Mortgage Corporation, successor by merger to Ocwen Loan Servicing, LLC ("Ocwen" or "PHH"), and US Bank N.A. ("US Bank") as Trustee for RAMP 2006EFC2, as follows:

## INTRODUCTION

1.    This action is filed to enforce regulations promulgated by the Consumer Finance Protection Bureau ("CFPB") that became effective on January 10, 2014, specifically, 12 C.F.R. §1024.35 and §1024.36 of Regulation X.

## PARTIES, JURISDICTION, AND VENUE

2.    Plaintiffs own the home located at and commonly known as 719 Kessler Boulevard East Drive, Indianapolis, IN, 46220 (the "Home").

3.      Plaintiffs purchased the Home on or about July 12, 2006, as their primary, principal residence and financed that purchase by a loan as evidenced by a note (the "Note") and a mortgage on the Home that allegedly secures the Note (the "Mortgage") (collectively referred to hereinafter as the "Loan"). By information and believe the Loan does not constitute and enforceable security interest.

4.      Plaintiffs have at all times relevant occupied the Home as their primary, principal residence.

5.      The Loan was originated by EquiFirst Corporation and subsequently placed in a mortgage-backed security guaranteed by Fannie Mae.

6.      Thereafter, ownership of the Note was transferred to US Bank, as Trustee for RAMP 2006EFC2.

7.      Initially, the Loan was serviced by GMAC Mortgage Corp. before servicing rights were transferred to Ocwen.

8.      Ocwen obtained servicing rights from GMAC Mortgage, while the Loan was in default.

9.      Ocwen is a wholly owned and operated subsidiary of Ocwen Financial Corporation and is a limited liability company incorporated under the laws of the State of Delaware.

10.     At all times relevant herein, Ocwen acted and acts as the agent of, and mortgage loan servicer for, US Bank.

11.     Ocwen regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

12.     At all times relevant herein, MDK and Codilis as agents of US Bank and Ocwen.

13.     Jurisdiction of claims against Ocwen is conferred by 28 U.S.C. §1331 as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Real Estate Settlement Procedures Act, 12 U.S.C. §2601, et seq. ("RESPA"), the Truth In Lending Act, 15 U.S.C. § 1639 et seq. ("TILA"), and the Fair Debt Collection Practices Act, 15 U.S.C. §1692, et seq. ("FDCPA").

14.     This Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. §1367.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the property that is the subject of the action is situated in this district.

## SUMMARY OF FEDERAL CLAIMS

### Claims under RESPA & Reg. X

16.     RESPA, originally enacted in 1974, was designed to ensure that consumers in real estate transactions would receive timely information on the nature and costs of the settlement process and would be protected from abusive practices.

17.     The Cranston-Gonzalez National Affordable Housing Act of 1990 expanded the scope of RESPA by addressing mortgage servicer practices. These amendments to RESPA followed reports of a substantial number of consumer complaints about mortgage servicing problems.

18.     In response to evidence of additional servicer abuses during the preceding mortgage crisis, RESPA was amended in 2010 by the Dodd-Frank Act to expand some of the statute's existing servicer requirements.

19.     RESPA's provisions relating to loan servicing are to be construed liberally so as to carry out the statue's remedial consumer protection purpose.  *Medrano v. Flagstaff Bank*, 704

F.3d 661, 665 (9ᵗʰ Cir. 2012); *Ellis v. General Motors Acceptance Corp.,* 160 F.3d 703, 707 (11th Cir. 1998) (RESPA is to be "construed liberally in order to best serve Congress' intent.")(citation omitted).

20.     In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111- 203, 124 Stat. 1376 (2010).

21.     Specifically, on January 17, 2013, the CFPB issued the RESPA Mortgage Servicing Final Rules, 78 F.R. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

22.     The Loan in the instant matter is a "federally related mortgage loan" as said term is defined by 12 C.F.R. §1024.2(b).

23.     Ocwen is subject to the aforesaid regulations and does not qualify for the exception for "small servicers," as such term is defined in 12 C.F.R. §1026.41(e)(4), nor the exemption for a "qualified lender," as such term is defined in 12 C.F.R. §617.700.

24.     Plaintiffs assert a claim for relief against Ocwen for violations of the specific rules under Regulation X as set forth below.

25.     Plaintiffs have a private right of action under RESPA pursuant to 12 U.S.C. §2605(f) for the claimed violations and such action provides for remedies including actual damages, costs, statutory damages, and attorneys' fees.

**Claims under the FDCPA**

26.     Congress enacted the FDCPA to prohibit the "[u]se of abusive, deceptive, and unfair debt collection practices." 15 U.S.C §1692a.

27.     The FDCPA applies to debt collectors, not original creditors.  Ocwen, Codilis, and MDK are "debt collector[s]" as defined by §1692a (6).

28.     Plaintiffs are each a "consumer" as defined by § 1692a (3), and the Loan is a "debt" as defined by 15 U.S.C. § 1692A (4). The Loan debt was incurred for personal, family and household purposes, the acquisition of Plaintiffs' Home.

29.     Plaintiffs assert a private right of action under the FDCPA pursuant to 15 U.S.C. §1692k for Ocwen's willful and deliberately indifferent conduct in connection with collection of the Loan.

## FACTUAL ALLEGATIONS

### Foreclosure Case

33.     In 2008, the Plaintiffs encountered financial difficulties after Gruesser lost her job; a reverberation of the great recession. This in turn led Plaintiffs to fall behind on their Loan payments.

34.     On November 5, 2009, US Bank initiated a foreclosure action against the Plaintiffs by filing a complaint to foreclose the Loan in the Marion County Superior Court No. 10 (Cause No. 49D10-0911-MF-051063) (the "Foreclosure Case").

35.     A true and accurate copy of the Complaint on Note and to Foreclose Mortgage on Real Estate ("Foreclosure Complaint"), without the exhibits originally filed therewith, is attached hereto as "Exhibit A."

36.     The Foreclosure Complaint sought: "a. personal judgment against Patricia K. Gruesser and Roderick M. Converse in a sum to be determined by the Court, consisting of the outstanding unpaid principal balance, together with interest from and after the date of default to the date of judgment at the adjustable rate set forth in the promissory note, late charges, default-

related expenses and advances, reasonable attorneys' fees and costs of this action, and other expenses incurred in connection with this cause."

37.    On January 20, 2010, US Bank filed its Motion for Default and Agreed Judgment.

38.    On January 28, 2010, US Bank filed a Default and Agreed Judgment Entry, Decree of Foreclosure, and Appointment of Auctioneer pursuant to Ind. Code § 32-30-10-9 ("Agreed Judgment").

39.    A true and accurate copy of the Agreed Judgment is attached hereto as "Exhibit B."

40.    The Agreed Judgment included a personal judgment against the Plaintiffs, "in the sum of $279,881.36, and any additional costs of collection, expenses, and disbursements incurred from the date of the Affidavit of Plaintiff to the date of Sheriff's Sale, including, but not limited to, Sheriff's Sale costs, disbursements for real estate taxes, bankruptcy fees and costs, and disbursements for hazard insurance premiums."

41.    The Agreed Judgment also states: "It is further ordered that in the event the proceeds generated from the Sheriff's Sale are insufficient to satisfy Plaintiff's judgment so that a deficiency exists, then Plaintiff shall have a personal money judgment in the sum of the deficiency."

### Plaintiffs' First Ch. 13 Bankruptcy Proceeding

42.    Because they wished to pay what they owed on the Loan and keep their Home, Plaintiffs filed a bankruptcy case.

43.    On March 19, 2010, Gruesser filed a case pursuant to Chapter 13 of the United States Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of Indiana, Case No. 10-03692-JMC-13 (hereinafter the "Bankruptcy Case").

44.    The Bankruptcy Case had the effect of staying the Foreclosure Case.

45.    Gruesser filed the Bankruptcy Case to cure all pre-petition defaults on the Loan through a repayment plan confirmed by the Bankruptcy Court.

46.    Shortly after filing, Gruesser proposed a Chapter 13 Plan [Filing No. 12] (the "Chapter 13 Plan"), which was confirmed on July 6, 2010, later modified by Order pursuant to 11 U.S.C. § 1329 on August 22, 2011, and modified for the final time on June 17, 2015.

47.    Pursuant to the Chapter 13 Plan, Plaintiffs were to make regular monthly payments of $2,800.00 to the Chapter 13 Trustee for two months commencing April 18, 2010; then $3,715.00 per month for 58 months, from which Ocwen would receive on behalf of US Bank approximately $1,029.00 per month to maintain the monthly payments it was owed, plus an additional sum to address all arrearage (originally estimated by Plaintiffs to be $15,000.00).

48.    US Bank appeared in the Bankruptcy Case and participated in the proceedings by filing a Proof of Claim (Claim No. 2 dated March 31, 2010 [Claim Filing No. 2-1].

49.    The Proof of Claim asserted a secured claim in the total amount of $292,534.03 and an arrearage claim of $37,698.45, which included: (a) escrow charges of $4,168.19; (b) late charges of $1,279.12; (c) Attorneys' Fees (listed separately with one claim for $1,000.00 and another for $150.00); (d) service of process fees of $13.00; (e) filing fees of $226.00; (f) a title commitment fee of $275.00, (g) sheriff sale costs of $216.00; (h) publication costs of $216.08; (i) property inspection fees of $45.00; and (j) appraisal/BPO fees of $83.00.

50.    The amount US Bank asserted and sought in the Proof of Claim ($292.535.03) is $12,653.67 more than the amount it asserted and sought only two months before in the Agreed Judgment ($279,881.36).

51.    On May 14, 2012, GMAC Mortgage announced it would be filing for bankruptcy.

52.    Servicing of the Loan transferred to Ocwen sometime thereafter.

53.    Ocwen appeared in the Bankruptcy Case and participated in the proceedings via the filing of a Notice of Payment Change.

54.    Ocwen participated in the proceedings and began servicing the Loan without filing of a Notice of Change in Servicer, a violation of Local Bankruptcy Rule B-3002.1-1(c).

**Attempts to Obtain Information and Refinance**

55.    The Plaintiffs wanted to refinance the Loan on their Home and get away from Ocwen and US Bank by seeking a VA loan.

56.    Around January of 2015, the Plaintiffs began exploring their refinancing options, including the possibility of obtaining a VA loan, and thus requested a payoff statement from Ocwen.

57.    On March 12, 2015, Ocwen provided the Plaintiffs with a Payoff Quote ("First Payoff Quote").

58.    A true and accurate copy of the First Payoff Quote is attached hereto as "Exhibit C."

59.    The First Payoff Quote reflected a "Total Amount Due" of $260,699.37, a "Next Due Date" of 06/01/2014, an "Escrow Advance" also known as a negative escrow balance of $3,925.85, and a "Late Charge – Alt Payment Plan" owed of $1,279.12.

60.    Thus, per the First Payoff Quote, Ocwen was seeking to collect $12,699.37 more than the original principal balance of the Loan of $248,000.00.

61.    On March 12, 2015, the Plaintiffs did not owe $260,699.27 on the Loan.

62.     According to the First Payoff Quote dated March 12, 2015, as evidenced by the "Next Due Date" of 06/01/2014, Ocwen then believed the Plaintiffs were 9 months behind on their payments.

63.     On March 12, 2015, the Plaintiffs were not 9 months behind on their payments.

**Plaintiff's First Ch. 13 Bankruptcy Proceeding Continues and Plaintiffs' Further Attempts to Obtain Information and Refinance**

64.     On April 20, 2015, the Chapter 13 Trustee in the Bankruptcy Case filed a Notice of Final Cure Payment [Filing No 86] pursuant to FRBP § 3002.1(f), stating the amount to cure the prepetition default had been paid in full and that Plaintiffs had completed all payments required under the plan.

65.     On August 6, 2015, Ocwen filed a Response to Notice of Final Cure Payment "[agreeing] that arrears in the amount $45,369.84 as stated in Creditor's Proof of Claim have been paid…"

66.     Within the same document, under the penalties for perjury, Ocwen affirmed Plaintiffs were current with all post-petition payments consistent with §1322(b)(5) of the Bankruptcy Code including all fees, charges, expenses, escrow, and costs.

67.     On August 21, 2015, Ocwen provided the Plaintiffs with a Payoff Quote ("Second Payoff Quote").

68.     A true and accurate copy of the Second Payoff Quote is attached hereto as "Exhibit D."

69.     To the Plaintiffs shock, the Second Payoff Quote reflected a "Total Amount Due" of $261,480.64, a "Next Due Date" of 10/01/2014, an "Escrow Advance" also known as a negative escrow balance of $3,929.97, and "Late Charges" totaling $1,279.12.

70.     The Second Payoff Quote also reflected a "Suspense Credit" of $1,231.59, a "Pre-Petition Credit" of $1,566.99, and a Post-Petition Credit of $1,402.41.

71.     Thus, per the Second Payoff Quote, Ocwen was seeking to collect $13,480.64 more than the original principal balance of the Loan ($248,000.00) and $781.27 more than it sought in the First Payoff Quote despite the Plaintiffs making numerous payments in the interim.

72.     Thus, per the Second Payoff Quote and as evidenced by the "Next Due Date" of 10/01/2014, Ocwen then believed the Plaintiffs were 10 months behind on their payments. One more month than reflected in the First Payoff Quote despite the Plaintiffs making payments in the interim.

73.     On August 21, 2015, the Plaintiffs did not owe $260,699.27 on the Loan.

74.     On August 21, 2015, the Plaintiffs were not 10 months behind on their payments.

75.     Frustrated, confused, and exhausted, the Plaintiffs became resigned to the fact they would lose their home and stopped making their monthly payments. They simply could not afford to continue scraping together and paying thousands of dollars for nothing.

76.     On September 9, 2015, Gruesser obtained an Order of Discharge in the Bankruptcy Case [Doc. 95].

77.     Per the Chapter 13 Plan, the Order of Discharge, and in light of the Response to Notice of Final Cure Payment, the Loan was to be reinstated according to the original terms and any right of US Bank and Ocwen to recover any amounts alleged to have arisen prior to her filing for bankruptcy was thereby extinguished.

78.     Immediately following the conclusion of the Bankruptcy Case, Ocwen treated the Loan as being ten months delinquent.

**Post-Bankruptcy and Continuation of Foreclosure Case**

79.     In June of 2016, Ocwen performed an audit of the Loan and discovered material errors. This resulted in the reversal or reapplication of thousands of dollars.

80.     Ocwen never notified the Plaintiffs of the foregoing errors. Ocwen never notified the Plaintiffs that the foregoing errors had the effect of creating a "manufactured state of default" or were the product of known failings with its mortgage servicing software, RealServicing. Plaintiffs discovered Ocwen's audit, and its previous misapplication of payments, sometime after March of 2019.

81.     On July 27, 2016, US Bank, by and through its agent MDK, filed a Notice of Relief from Stay and Abandonment in the Foreclosure Case ("Notice of Relief from Stay").

82.     A true and accurate copy of the Notice of Relief from Stay and Abandonment is attached hereto as "Exhibit E."

83.     The Notice of Relief from Stay was filed based entirely upon information provided by Ocwen.

84.     In the Notice of Relief from Stay, US Bank states: "Further, the property at issue has been abandoned from the bankruptcy estate under 11 U.S.C. § 554."

85.     In the Notice of Relief from Stay, US Bank states: "As the automatic stay is no longer in effect and the property has been abandoned, Plaintiff is permitted to proceed with this foreclosure action."

86.     The Home was not abandoned from the bankruptcy estate during the Bankruptcy Case.

87.     The Plaintiffs have never physically abandoned the Home.

88.     U.S. Bank's statements in the Notice of Relief from Stay were materially false and were made in an attempt to collect money not due from Plaintiffs.

89.     The filing of the Notice of Relief from Stay had the effect of reinstituting the Foreclosure Case.

90.     On August 3, 2016, MDK filed a Motion to Amend January 29, 2010 Judgment Entry Nunc Pro Tunc.

91.     A true and accurate copy of the Motion to Amend January 29, 2010 Judgment Entry Nunc Pro Tunc is attached hereto as "Exhibit F".

92.     The Motion to Amend January 29, 2010 Judgment Entry Nunc Pro Tunc does not seek to amend the Judgment to an *in rem* judgment nor does it make any reference to crediting funds paid by the Plaintiffs during the Bankruptcy Case to the Judgment.

93.     By filing the Motion to Amend, U.S. Bank made false statements and attempted to collect money the Plaintiffs did not owe.

### Plaintiff's Second Ch. 13 Bankruptcy Proceeding

94.     Completely unaware of Ocwen's misapplication of payments, confused about where their previous payments had gone, still fearful that any money paid to Ocwen would "disappear", but desperate to save their Home, Gruesser again turned to the protections afforded in bankruptcy.

95.     On December 20, 2017, Gruesser filed a second bankruptcy case pursuant to Chapter 13 of the United States Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of Indiana, Case No. 10-03692-JMC-13 (hereinafter the "Second Bankruptcy Case").

96.     The Second Bankruptcy Case had the effect of staying the Foreclosure Case.

97.     On January 11, 2017 the Second Bankruptcy Case was dismissed.

### Foreclosure Case Continued

98.     On March 14, 2017, Gruesser filed an Emergency Motion for Hearing.

99.     A true and accurate copy of the Emergency Motion for Hearing is attached hereto as "Exhibit G".

100.    The Emergency Motion for Hearing states: "Patricia Kay Gruesser does not know what amounts the Judgment Plaintiff or its assignee is seeking to recover from the sale of the property at the sheriff's sale, the basis for any additional charges which the Judgment Plaintiff or its assignee claims are due and owing on the Judgment other than post-judgment interest."

101.    The Emergency Motion for Hearing states: The Judgment Defendant and her husband wish to obtain a VA loan to pay off the Judgment Plaintiff or its assignee but have been unable to do so because they do not know the exact amount that is due and owing on the 2010 judgment after subtracting payments that have been made…."

102.    On June 15, 2017, MDK filed a Notice of Compliance advising it had provided the payment history and payoff quote requested at the hearing held on March 31, 2017.

103.    The payment history provided by MDK, from Ocwen, was incomplete and did not plainly reflect how funds pay on the Loan had been applied or utilized.

104.    The payoff quote provided by Ocwen clearly did not include credit for payments made during the course of the Bankruptcy Case. Still completely unware of Ocwen's misapplication of payments and assessment of improper fees, information only ascertainable via a complete audit of the Loan, Gruesser served a set of discovery requests ("Gruesser Discovery Requests").

105.     A true and accurate copy of the Gruesser Discovery Requests are attached hereto as "Exhibit H".

106.     The Gruesser Discovery Requests sought documents and items including: "4. All documents used by plaintiff or its assignor or agents which were used to determine the amount due and owing to plaintiff or its assignor by defendant in personam or in rem on the judgment in this lawsuit."

107.     The Gruesser Discovery Requests sought documents and items including: "5. All documents under the plaintiff's possession or control showing how each payment made by or on behalf of the defendant was credited to accruing interest or principal on the unpaid judgment."

108.     The Gruesser Discovery Requests sought documents and items including: "6. A copy of Plaintiff's accounts receivable ledger and records showing amounts Defendant owes plaintiff in rem or in personam."

109.     On June 26, 2017, MDK filed a Motion for Entry of Protective Order.

110.     At the time the Motion for Entry of Protective Order was filed, Ocwen knew it had misapplied the Plaintiffs' payments and assessed improper fees and costs during the Bankruptcy Case.

111.     At the time the Motion for Entry of Protective Order was filed, Ocwen knew the amount it was seeking to collect did not include any credit for sums paid by Gruesser during the First Bankruptcy Case.

112.     On July 14, 2017, Gruesser filed her Response to Plaintiff's Motion for Entry of Protective Order ("Response to Motion for Entry of Protective Order").

113.     A true and accurate copy of the Response to Motion for Entry of Protective Order is attached hereto as "Exhibit I".

114.     The Response to Motion for Entry of Protective Order notified the court of, and included as an attachment thereto, a copy of the lawsuit initiated by the Consumer Financial

Protection Bureau against Ocwen in Cause No. 9:17-CV-80495 in the Southern District of Florida.

115.    The Response to Motion for Entry of Protective Order states: "Various charges and expenses have been assessed to the Defendants in this case with no adequate explanation as to what such charges or expenses are or how they were computed. Defendant seeks to find out whether these numbers have any basis in fact. Defendant has had no opportunity to object or inquire about the charges and expenses as they were assessed after the judgment was rendered. The Request for Production of Documents which was served on the Plaintiff is served pursuant to Trial Rule 28(H) which states: "Discovery after Judgment may be had in proceedings to enforce or to challenge the judgment." Defendant has every right to inquire expenses and charges which have been added unilaterally to the amount due on the judgment by the Plaintiff or its agents."

116.    On July 21, 2017, US Bank filed its Motion to Partially Strike Defendant's Response to Plaintiff's Motion for Protective Order and Response. A true and accurate copy of the Motion to Partially Strike Defendant's Response to Plaintiff's Motion for Protective Order and Response is attached hereto as "Exhibit J".

117.    At the time the Motion to Partially Strike Defendant's Response to Plaintiff's Motion for Protective Order and Response was filed, Ocwen knew: a) it had unlawfully assessed or reimbursed itself for expenses and charges; b) its RealServicing Platform contained significant problems particularly related to accounts involved in bankruptcy; c) it had previously misapplied payments paid by the Plaintiffs; d) it had not credited payments received during the Bankruptcy Case to the amount it sought to collect; and, e) the information it had been provided was inaccurate.

118.    At the time the Motion to Partially Strike Defendant's Response to Plaintiff's Motion for Protective Order and Response was filed, Ocwen knew: a) the amount it sought to collect did not include any credit for the payments the Plaintiffs had made during the Bankruptcy Case; b) its record keeping was likely to be inaccurate; c) it could not substantiate or justify the fees or charges sought to be collected or previously collected; and, d) that if forced to respond to them, the Gruesser Discovery Requests would likely expose each of the foregoing.

119.    The Motion to Partially Strike Defendant's Response to Plaintiff's Motion for Protective Order and Response again requests discovery not be had and states: "The pleadings are further scandalous as they attempt to paint a picture that Plaintiff has committed some sort of fraud or wrong-doing under various federal laws and this Court cannot consider information that is irrelevant as to this Plaintiff and scandalous as to how the Defendant has characterized the servicing of this loan based on a complaint filed in another court, in another case, on another loan.

120.    At the time the Motion to Partially Strike Defendant's Response to Plaintiff's Motion for Protective Order and Response was filed, US Bank, by and through the acts and omissions of its agent Ocwen, had committed fraud or wrong-doing under various federal laws relative to its servicing of the Loan, in that very case, in that very court.

121.    On July 26, 2017, Gruesser filed her Supplemental Response to Plaintiff's Motion for Entry of Protective Order ("Supplemental Response to Plaintiff's Motion for Entry of Protective Order").

122.    A true and accurate copy of the Supplemental Response to Plaintiff's Motion for Entry of Protective Order is attached hereto as "Exhibit K".

123.    The Supplemental Response to Plaintiff's Motion for Entry of Protective Order states: "Defendant Patricia Kay Gruesser and Roderick M. Converse have received a check No. 05926204 dated 6/9/17 from plaintiff's servicing agent Ocwen Loan Servicing, LLC. in the amount of $1,265.04. A true and correct copy of that check is attached as Exhibit C. Such check referenced 729 Kessler Blvd which is the property address which is the subject of our foreclosure case. No documentation accompanied the checking indicating why the check was sent to defendants."

124.    A true and accurate copy of the check referenced in, and attached as Exhibit C to, the Supplemental Response to Plaintiff's Motion for Entry of Protective Order is attached hereto as "Exhibit L".

125.    Sometime in 2019, Plaintiffs learned Ocwen issued the check for $1,265.04 because it had identified additional servicing errors requiring it to refund this amount to them.

126.    In the Motion To Vacate Judgment And To Dismiss Case Without Prejudice, MDK states: "A Notice of Final Cure was filed making the loan due and current as of 5/2017."

127.    However, Plaintiffs made timely and adequate mortgage payments to Ocwen from May of 2017 to May of 2018. In May of 2018, Ocwen began rejecting payments improperly and in violation of existing Seventh Circuit case law, *see Catalan v GMAC Mortg Corp*, 629 F 3d 676 (7th Cir, 2011).

128.    On September 21, 2018, MDK filed a Motion for Partial Satisfaction of Judgment on behalf of US Bank.

129.    A true and accurate copy of the Motion for Partial Satisfaction of Judgment is attached hereto as "Exhibit M".

130.    The Motion for Partial Satisfaction of Judgment states: "As evidence by Plaintiff's Affidavit, a total of $136,423.59 has been applied to the account through the [B]ankruptcy [C]ase."

131.    A true and accurate copy of the Plaintiff's Affidavit referenced above and filed on September 21, 2018 ("Ocwen Affidavit") is attached hereto as "Exhibit N".

132.    The Ocwen Affidavit was prepared on March 26, 2018 by a Contract Management Coordinator employed by Ocwen.

133.    The Ocwen Affidavit erroneously states that all sums paid through the Bankruptcy Case have been properly applied to the account and as a result thereof a total $8,276.66 had been applied to Principal Amount of the Loan and $128,146.93 had been applied to the Interest Amount of the Loan.

134.    The Motion for Partial Satisfaction of Judgment also states: "In the interest of expediency, Plaintiff voluntarily shows that the amount of $136,423.59, which was received during the bankruptcy, shall be applied to the unpaid principal balance on the Judgement dated January 28, 2010, which shall reduce the overall judgment amount and interest due pursuant to the Judgment in a way most favorable to the Defendant Patricia Gruesser in this matter. The IN REM judgment amount due shall be show as follows:

135.    The Judgment obtained and sought to be collected upon by US Bank in the Foreclosure Case was not an "IN REM" judgment.

136.    Contrary to the language above, the Motion for Partial Satisfaction of Judgment ultimately seeks to reduce the judgment from "$279,881.36, plus additional costs of collection," to $242.721.20.

137.    The Motion for Partial Satisfaction of Judgment states: "Plaintiff asks this Court to permit it to seek recourse against the collateral after almost ten years of no payments being made and having to endure a federal lawsuit and multiple bankruptcies filed by the Defendant."

138.    Ocwen and U.S. Bank knew the aforementioned statement was false because the Plaintiffs had made payments of $136,423.59 during the previous ten years.

139.    Counsel for US Bank, MDK, knew the allegation made in paragraph 16 above were false and materially misleading and were designed to improperly, and through misrepresentation of fact, induce the Court to act.

**Converse's Ch. 13 Bankruptcy Proceeding**

140.    With his financial situation continuing to be dire, completely unaware of the nature or extent of Ocwen's acts, yet still desperate to avoid losing his Home, Converse turned to the protections afforded by the bankruptcy code.

141.    On January 14, 2019, Converse filed for bankruptcy in the United States Bankruptcy Court for the Southern District of Indiana, Case No. 19-00219-RLM-13 (hereinafter the "Third Bankruptcy Case").

142.    The Third Bankruptcy Case had the effect of again staying the Foreclosure Case.

143.    US Bank appeared in the Bankruptcy Case and participated in those proceedings by filing a Proof of Claim (hereinafter "Second Proof of Claim")(Claim No. 1 dated February 21, 2019 [Claim Filing No. 1-1]).

144.    The Second Proof of Claim was filed utilizing if not entirely based upon information provided by Ocwen.

145.    The Second Proof of Claim contains materially false and misleading information and was filed with specific intent and actual knowledge of the falsities contained therein.

146.   The Proof of Claim also asserts an unpaid principal balance on the Loan of $237,796.55; $8,276.66 less than the Unpaid Principal Balance of $246,073.21 asserted in the Motion for Partial Satisfaction of Judgment.

147.   The Proof of Claim asserts a total debt of $337,498.73; $94,777.53 more than the "IN REM judgment amount due and owing" of $242,721.20 asserted only five months before in the Motion for Partial Satisfaction of Judgment.

148.   The Third Bankruptcy Case remains pending.

### Ocwen's Servicing Misconduct

149.   Sometime in early 2018, Plaintiffs obtained a *partial* reproduction of Detailed Transaction History Report ("Partial Detailed Transaction History Report"). The Partial Detailed Transaction History Report is not the same as a Life of Loan History which reflects the current mortgage balance, the date of receipt and application of all payments, the date of assessment for any late fees or charges, and the recording of any corporate advances for any legal fees or charges, including without limitation property inspection fees, legal fees, escrow fees, processing fees and any other collateral charges.

150.   Plaintiffs have *still* never received a complete Life of Loan history from Ocwen. Without a complete Life of Loan History the nature and extent of servicing misconduct is nearly impossible to detect.

151.   In early 2019, an audit of the Partial Detailed Transaction History Report was performed and revealed a myriad of improper servicing conduct committed by Ocwen.

152.   A true and accurate copy of the Partial Detailed Transaction History Report is attached hereto as "Exhibit O".

153.   During the course of the Bankruptcy Case, Ocwen assessed then paid itself for improper fees, charges, and advances.

154.   Ocwen did not provide notice of the charging of these fees and expenses to the Bankruptcy Court as required by FRBP § 3002.1.

155.   In addition, the Life of Loan History reflects that during the First Bankruptcy Case and thereafter, Ocwen maintained a large surplus balance in suspense.  The highest balances were $5,860.92 on October 7, 2013; $4,452.41 on February 7, 2014; $3,479.00 on June 2, 2014; $4,020.39 on September 4, 2014; $3,588.37 on December 21, 2017; $2,092.96 on February 6, 2018; and $84,910.53 on April 27, 2018.

156.   Ocwen's retention of funds in excess of a regular payment amount in suspense, instead of properly applying these funds to principal, interest, and escrow as contractually and legally obligated, caused it to charge Plaintiffs with fees and additional interest without basis.

157.   Ocwen's retention of funds in suspense in excess of the regular monthly payment amount deprived Plaintiffs of the time value of that money as Ocwen did not pay interest towards the balance.

158.   In addition, the partial Life of Loan History reflects that Ocwen's unlawful conduct included, or otherwise caused, a manufactured negative escrow balance to exist almost continuously throughout Plaintiffs' Bankruptcy Case and thereafter. The largest negative balances were -$8,492.21 on December 31, 2013; -$6,458.15 on May 6, 2014; -$7,396.71 on September 4, 2014; -$6,599.27 on April 7, 2015; -$5,099.73 on June 30, 2015; -$10,124.00 on December 21, 2017; and -$23,288.85 on or about February 6, 2018.

159.   An escrow account is a form of trust account.  Ocwen had no right or authority to debit funds in this manner or outside the requirements of the Loan.

160.    In addition, pursuant to the Loan, if the amount withheld in the escrow account for insurance and taxes were insufficient, Ocwen was required to notify Plaintiffs of the shortage as proscribed by RESPA, 12 U.S.C. § 2601 et seq.

161.    Ocwen failed to provide Plaintiffs with notice of the shortage or explanation for the activities underpinning the negative escrow balances set forth above.

162.    By maintaining a negative escrow balance, Ocwen caused Plaintiffs to incur fees, penalties and/or interest that she would not have otherwise.

163.    In addition, by maintaining a negative escrow balance following the conclusion of the Bankruptcy Case, Ocwen violated the discharge injunction ordered therein and deprived her of the fresh start to which she was entitled.

164.    By maintaining a negative escrow balance during the course of the Bankruptcy Case, Ocwen failed to provide notice to the Court of those alleged charges as required by FRBP § 3002.1.

**Plaintiffs' Efforts to Seek Information from Ocwen**

165.    Throughout this whole process, Plaintiffs merely wanted to pay what they honestly owed and save their Home.  Repeated phone conversation took place in an erstwhile effort to resolve the amounts due on the Loan. Yet, despite Plaintiffs' efforts, no resolution could be reached and Ocwen continued to provide erroneous and false information to Plaintiffs.

166.    On February 13, 2019, Plaintiffs directed correspondence to Ocwen captioned "Request for Information Pursuant to Section 1024.36 of Regulation X" ("RFI No. 1) seeking information and documents including without limitation: (i) an exact reproduction of the life of loan mortgage transactional history for this loan on the system of record used by [Ocwen]; (ii) a copy of, or print out of, all credit reporting data and/or e-Oscar AUD's provided to or received

from any credit reporting agency with regard to the loan identified herein including but not limited to the Global Events Management (GEM) screen shot from MSP; and, (iii) a complete statement of the amount of money which the Borrower must pay to cure any outstanding default(s) on this loan and itemizing the components of that cure payment figure including principal, accrued interest, late fees, corporate advances, legal fees and any other fees and charges included in the sum required to cure any outstanding default(s). A true and accurate copy of RFI No. 1 is attached hereto as "Exhibit P".

167.     Ocwen received RFI No. 1 on February 16, 2019, as evidence by USPS Certified Mail Tracking No. 70172620000078861412.

168.     On April 4, 2019, Ocwen provided a response to RFI No. 1.

169.     A true and accurate copy of the cover letter to Ocwen's response to RFI No. 1 is attached hereto as "Exhibit Q".

170.     In its response to RFI No. 1, Ocwen provided a partial Detailed Transaction History Report, not the requested Life of Loan History.

171.     Ocwen knows consumers such as the Plaintiffs require a Life of Loan History to conduct a full examination of their loans. By provided a partial Detailed Transaction History Report, Ocwen caused the Plaintiffs an information injury and deprived them of the ability to conduct a full audit of their Loan.

172.     In its response to RFI No. 1, Ocwen also did not provide a copy of:  (i) a complete statement of the amount of money which the Borrower must pay to cure any outstanding default(s) on this loan and itemizing the components of that cure payment figure including principal, accrued interest, late fees, corporate advances, legal fees and any other fees and charges included in the sum required to cure any outstanding default; or (ii) a copy of, or print

out of, all credit reporting data and/or e-Oscar AUD's provided to or received from any credit reporting agency with regard to the loan identified herein including but not limited to the Global Events Management (GEM) screen shot from MSP.

173.    Ocwen's failure to provide the documents above caused Plaintiffs an information injury and was itself a violation of RESPA.

174.    Specifically, if Plaintiffs had been provided the documents they requested and were legally entitled to receive, they would have been better able to respond to the default claims by relaying information contained therein as a defense in their foreclosure proceedings and/or provide Ocwen with a more detailed description of its errors before its initiation.

175.    Ocwen knows by refusing or otherwise failing to provide a complete Life of Loan History, it becomes much more difficult for borrowers such as the Plaintiffs to identify or detail problems with their accounts.

176.    On March 6, 2019, Plaintiffs directed correspondence to Ocwen captioned "Request for Information Pursuant to Section 1024.36 of Regulation X" ("RFI No. 2) seeking information and documents including without limitation: (i) the identity and description of all available loss mitigation options; (ii) copies of any previously provided notices detailing available loss mitigation options; (iii) copies of every escrow analyses performed by Ocwen from Jan. 1 or 2010 to July of 2015; and (iv) copies of all collection letters and notices directed to the Plaintiffs in 2015.

177.    A true and accurate copy of RFI No.2 is attached hereto as "Exhibit R".

178.    Ocwen received RFI No. 2 on March 11, 2019, as evidence by USPS Certified Mail Tracking No. 70172620000078863928

179.    Ocwen failed to acknowledge or respond to RFI No. 2.

180.    Ocwen's failure to provide the documents set forth above caused Plaintiffs an information injury and distress.

181.    Specifically, if Plaintiffs had been provided the documents they requested and were legally entitled to receive, they would have been better able to respond to the default claims by relaying information contained therein as a defense in their foreclosure proceedings and/or provide Ocwen with a more detailed description of its errors before its initiation.

182.    Ocwen knows by refusing or otherwise failing to provide a complete Life of Loan History, it becomes much more difficult for borrowers such as the Plaintiffs to identify or detail problems with their accounts.

183.    On September 12, 2019, Plaintiffs directed correspondence to Ocwen captioned "Request for Information Pursuant to Section 1024.36 of Regulation X" ("RFI No. 3) seeking information and answers to the following: "On June 9, 2017, Ocwen issued a check to Ms. Patricia Gruesser and Roderick Converse in the amount of $1,265.04. See attached. Please identify the source of the funds, the purpose and an explanation for why the check was written." A true and accurate copy of RFI No. 3 is attached hereto as "Exhibit S".

184.    Ocwen received RFI No. 3 on September 16, 2019, as evidenced by USPS Certified Mail Tracking No. 70172620000078861412.

185.    Ocwen failed to acknowledge or respond to RFI No. 3.

186.    On August 7, 2019, Plaintiffs directed correspondence to PHH, successor by merger to Ocwen, entitled "Request for Information Pursuant to Section 1024.36 of Regulation X" ("PHH RFI No. 1") via USPS Certified Mail Tracking No. 70190700000038356469 which was delivered August 12, 2019.

187.   On September 11, 2019, and September 25, 2019 PHH responded to PHH RFI No. 1 by, first, stating that no error had been determined to have occurred and, secondly, by providing a partial transactional history and list of transaction codes.

188.   PHH took no action to address the errors that Plaintiffs apprised PHH of in PHH RFI No. 1.

189.   On August 21, 2019, Plaintiffs directed correspondence to PHH, now acquired by Ocwen, entitled "Second Request for Information Pursuant to Section 1024.36 of Regulation X" ("PHH RFI No. 2") via USPS Certified Mail Tracking No. 70190160000036649806 which was delivered August 26, 2019.

190.   On September 24, 2019 and October 17, 2019 PHH responded to PHH RFI No. 2 by, first, providing certain mortgage and note information previously requested and, secondly, by providing a flash drive with some of the other requested documentation such as broker price opinions and inspection reports.

**Plaintiffs' Efforts to Have Errors Corrected.**

191.   On March 6, 2019, Plaintiffs directed correspondence to Ocwen captioned "Notice of Errors under 12 C.F.R. §1024.35 of Regulation X" ("NOE No. 1") identifying servicing errors including without limitation: (i) failing to promptly and accurately apply payments made by the Plaintiffs during Bankruptcy proceedings as required by Regulation Z, C.F.R. § 1026.36(c)(1) and/or 15 U.S.C. §1639(f); (ii) failing to perform an escrow analysis annually or accurately resulting in the Plaintiffs having a negative escrow balance (-$5,833.05) following the conclusion of the Bankruptcy Case, in violation of 12 CFR § 1024.17 (c) and 12 U.S.C. § 2609(a) and (iii) failing to provide an accurate payoff statement at the conclusion of the

Borrower's first bankruptcy and within its Proof of Claim filed on February 21, 2019, as required by 1026.36(c)(3) of Regulation Z.

192.    NOE No. 1 also requested Ocwen provide all documents it relied upon if it were to determine no error had occurred, per Reg. X, 12 C.F.R. §§ 1024.35(e)(1).  A true and accurate copy of NOE No. 1 is attached hereto as "Exhibit T".

193.    By and through NOE No. 1, and their other communications with Ocwen representatives, Plaintiffs brought the aforementioned errors to Ocwen's attention, made them aware of the false default status on the Loan, and requested that the errors be investigated and corrected.

194.    Ocwen received NOE No. 1 on March 9, 2019, as evidenced by USPS Certified Mail Tracking No. 70172620000078864840.

195.    Ocwen did not take any action within thirty business days to investigate or correct the distinct errors identified in NOE No. 1.

196.    To date, Ocwen nor PHH have provided a substantive response to the errors identified in NOE NO. 1.

197.    If Ocwen had performed a reasonable investigation into the errors set forth in NOE No. 1 relative to Plaintiffs' escrow account it would have refunded the escrow surplus not just notified her, "that the escrow funds are available to be refunded to Ms. Plaintiffs if she so requests."

198.    Likewise, if Ocwen had conducted a reasonable investigation into the errors set forth in NOE No. 1, it would have refunded fees as described therein not just those reflected "in the payment history provided on January 7, 2019."

199.    In addition, if Ocwen had conducted a reasonable investigation into the errors set forth in Paragraph 5 of NOE No. 1 relative to the property inspection fees, it would have removed the fees from the Loan not just promised to do so in the future.

200.    In addition, if Ocwen had conducted a reasonable investigation into the errors set forth in Paragraph 5 of NOE No. 1, it would have determined that funds had been wrongly placed in suspense for various times since the start of the Bankruptcy Case.

201.    Despite being requested in NOE No. 1, Ocwen did not provide the documents or information it relied upon in reaching its apparent determination, as required by Reg. X, 12 C.F.R. § 1024.36(e)(4).

202.    On August 7, 2019, Plaintiffs directed correspondence to Ocwen captioned "Second Notice of Errors under 12 C.F.R. §1024.35 of Regulation X" ("NOE No. 2") identifying servicing errors including without limitation: (i) failing to adequately respond to RFI No. 1 by way of its omission of a complete Life of Loan History and the previously requested credit reporting information, separate and distinct errors incorporated into 12 C.F.R. 1024.35(b)(11); and, (ii) failing to conduct a reasonable investigation of, and/or provide a response to NOE No. 1. A true and accurate copy of NOE No. 2 is attached hereto as "Exhibit U".

203.    NOE No. 2 also disputed any information or reporting previously made by Ocwen to any credit bureau suggesting she was delinquent or had an unpaid balance.

204.    NOE No. 2 requested that Ocwen take specific actions to correct the errors identified therein.

205.    Ocwen received NOE No. 2 on August 12, 2019 as evidenced by USPS Certified Mail Tracking No. 70190700000038356476.

206.    By letter dated August 16, 2019, Ocwen, by counsel, acknowledged receipt of NOE No. 2.

207.    A true and accurate copy of Ocwen's correspondence acknowledging receipt of NOE No. 2 is attached hereto as "Exhibit V".

208.    By letter dated August 21, 2019, Ocwen, by counsel, provided an additional acknowledgment letter and partial response to NOE No. 2 stating: "In relation to your allegations concerning a payoff statement requested by borrowers' at the conclusion of Patricia Gruesser's bankruptcy action, you have alleged that the payments made by Patricia Gruesser during her Chapter 13 proceeding were not properly applied to the loan account and dispute escrow charges and fees applied against the loan account. We are investigating these allegations and all other matters stated in your correspondence dated August 7, 2019, and will provide a response as soon as possible."

209.    A true and accurate copy of Ocwen's correspondence dated August 21, 2019 as referenced above, is attached hereto as "Exhibit W".

210.    On October 2, 2019, Ocwen responded to NOE No. 2 stating in part: (i) "RFI No. 1 included a request for a "transactional history" for the Loan from the system of record used by Ocwen. In response, Ocwen timely produced a complete Detail Transaction History Report generated from Ocwen's system of record."; (ii) "PHH MC completed a reasonable investigation of the matter asserted and is unable to locate correspondence in response to NOE No. 1."; (iii) "The escrow deficiency in the amount of $5,833.05, that existed as of June 29, 2016, is not a false escrow deficiency." and, (iv) "The Proof of Claim filed on February 21, 2019 is accurate. The Loan is now due for the May, 2015 installment."

211.     A true and accurate copy of Ocwen's response to NOE No. 2, dated October 2, 2019 as referenced above, is attached hereto as "Exhibit X."

212.     The Detail Transaction History Report provide by Ocwen in response to RFI No. 1 is neither complete or a Life of Loan History as described therein. A Detail Transaction History Report does not contain all of the information reflected in a Life of Loan History.

213.     As reflected above, Ocwen's response to NOE No. 2 does not acknowledge any error regarding a failure to respond to NOE No. 1. Instead it suggests it was merely "unable to locate the correspondence."

214.     Inexplicably, as reflected within its response to NOE No. 2, Ocwen also contends any alleged error regarding the application of Loan payments was corrected *prior* to the issuance of NOE No. 1; without indication about when said corrections occurred or why.

215.     If Ocwen had performed a reasonable investigation into the alleged errors regarding the Plaintiffs' escrow account, it would have determined and acknowledge it had failed to perform one or more escrow analyses during the duration of the First Bankruptcy Case. *See Guccione v. JPMorgan Chase Bank*, 2015 WL 1968114 (N.D. Cal. May 1, 2015)(servicer's response that there was no error with escrow account contradicted by three documents sent to the borrower each stating that a different escrow amount was owed);

216.     Likewise, if Ocwen had conducted a reasonable investigation into the errors identified in NOE No. 2, it would have determined the Proof of Claim filed on February 21, 2019 was inaccurate.

217.     In addition, Ocwen's response to NOE No. 2 wherein it fails acknowledge any error is contradicted by its decision to unilaterally apply funds held in escrow to the principal balance and remove "certain charges." *see, also, Wilson v. Bank of Am.*, 48 F. Supp. 3d 787

(E.D. Pa. 2014)(Plaintiff sufficiently alleged that servicer did not conduct a reasonable investigation of her notices of error where the servicer sent her response with contradictory explanations for why the actions she requested were not taken).

218.   Any reasonable investigation into the errors alleged by NOE No. 2, would have resulted in some action being taken to address them.

219.   If Ocwen had performed a reasonable investigation into the errors set forth in NOE No. 2 they would have acknowledged their existence, including but not limited to the failure to investigate or respond to the errors identified in NOE No. 1.

220.   On September 4, 2019, prior to their receipt of Ocwen's response to NOE No. 2, Plaintiffs directed duplicate correspondence to Ocwen and PHH captioned "Third Notice of Errors under 12 C.F.R. §1024.35 of Regulation X" ("NOE No. 3") identifying servicing errors including without limitation: (i) failing to appropriately or timely pay taxes, insurance premiums, or other charges, including charges that the consumer has voluntarily agreed that the servicer should collect and pay, as required by the escrow provisions of § 1024.34(a); (ii) failing to send Interest Rate and/or Payment Change Notices as required by Reg., Z, 12 C.F.R. 1026.20 (c) and (d); (iii) failing to apply an accepted payment to principle, interest, escrow, or other charges under the terms of the mortgage loan and applicable law; (iv) failing to perform an escrow analysis annually or accurately resulting in the Plaintiffs having a negative escrow balance immediately following the conclusion of the Bankruptcy Case and, (v) seeking to collect amounts not owed via the Proof of Claim filed on February 21, 2019.

221.   A true and accurate copy of NOE No. 3 is attached hereto as "Exhibit Y".

222.   NOE No. 3 also requested Ocwen provide all documents it relied upon if it were to determine no error had occurred, per Reg. X, 12 C.F.R. §§ 1024.35(e)(1).

223.    PHH received NOE No. 3 on September 9, 2019, as evidenced by USPS Certified Mail Tracking No. 70190700000038355745.

224.    Ocwen received NOE No. 3 on September 12, 2019, as evidenced by USPS Certified Mail Tracking No. 70190700000038355738.

225.    On October 16, 2019, Ocwen responded to NOE No. 3.

226.    A true and accurate copy of Ocwen's response to NOE No. 3, dated October 16, 2019, is attached hereto as "Exhibit Z"

227.    Ocwen failed to perform a reasonable investigation into the errors contained in NOE No. 3.  Any reasonable investigation into the contents of NOE No. 3 would have resulted in an acknowledgement of error and some corrective action.

228.    Ocwen failed to take any corrective action responsive to the errors raised in NOE No. 3.

229.     Ocwen's response to NOE No. 3 is contradicted by its apparent decision to unilaterally apply funds without notifying the Plaintiffs.  *See Guccione v. JPMorgan Chase Bank*, 2015 WL 1968114 (N.D. Cal. May 1, 2015)(servicer's response that there was no error with escrow account contradicted by three documents sent to the borrower each stating that a different escrow amount was owed); *see, also, Wilson v. Bank of Am.*, 48 F. Supp. 3d 787 (E.D. Pa. 2014)(Plaintiff sufficiently alleged that servicer did not conduct a reasonable investigation of her notices of error where the servicer sent her response with contradictory explanations for why the actions she requested were not taken).

### Impact on, and Damage to, Plaintiffs

230.    Due to the actions of Ocwen, Plaintiffs continue to be subjected to collection accounts seeking amounts they do not owe.

231.    Due to the actions of Ocwen, Plaintiffs were denied the opportunity to refinance their home and forced to defend against ongoing attempt to take their home to collect amounts they did not owe.

232.    Throughout this entire ordeal, Plaintiffs have only wanted to pay what they owe on the Loan and live their lives without fear of losing the Home to foreclosure.

233.    The impact of Ocwen's conduct on Plaintiffs has been severe emotionally, financially and even physically.

234.    For months, Plaintiffs faced this hardship alone, without the assistance of counsel, yet continued to do their best to cope with the abusive, false and fraudulent collection activities of US Bank and Ocwen.

235.    By wrongfully seeking to collect upon the Judgment, amounts not owed, and/or neglecting to intervene,  Ocwen caused Plaintiffs to suffer great emotional distress driven by the fear they would not only lose their Home but every dime of equity they may have in it, as result of the wrongfully imposes fees and penalties. This fear has resulted in loss of sleep, anxiety, embarrassment, and other significant emotional distress.

236.    The aforementioned emotional distress started at the conclusion of the First Bankruptcy Case then continued and exacerbated each of the events detailed herein.

237.    In addition, because of the false information Ocwen provided to MDK and others, which in turn was used as a basis for reopening and proceeding forward the foreclosure proceedings, it has created an adverse public record – a scarlet letter if you will – that can never be removed.

238.    Furthermore, the foregoing actions have caused Plaintiffs to incur damage in the form of time away from work, travel expenses, attorney fees to defend the various legal actions

and claims raised herein as well as to assist in preparing Notices of Errors, and the preparation and prosecution of this action.

239.    Because of the false "default" status on the Loan immediately following the First Bankruptcy Case, Ocwen has imposed a number of unwarranted fees on the Loan including improper late fees and improper default service fees, such as fees for property inspection, and corporate advances, that they have failed to remove.

240.    In addition, the actions of Ocwen, in wrongfully and falsely claiming that the Loan was in default immediately following the conclusion of the First Bankruptcy Case, caused Plaintiffs to suffer harm to their credit and made it impossible for them to refinance.

**Ocwen's Pattern and Practice of Illegal Conduct**

241.    Ocwen has engaged in a pattern and practice of mistreating mortgage loan borrowers and violating provisions of RESPA and the regulations promulgated thereunder at Regulation X.

242.    That pattern and practice entails dozens of servicing errors and a continued refusal to correct those errors in the present case.

243.    In addition, at the time of the filing of the Complaint, Ocwen has had at least 27,500 consumer complaints lodged against it nationally, specifically concerning the issue identified on the CFPB's consumer complaint database as "loan modification, collection, foreclosure" related to mortgage products.  Each such complaint is filed and cataloged in the CFPB's publicly accessible online database, which can be located at the following hyperlink: http://www.consumerfinance.gov/complaintdatabase/.

244.    On April 20, 2017, the CFPB filed suit against Ocwen in the Federal District Court for the Southern District of Florida (Case No. 9:17-cv-80495) ("CFPB Lawsuit").

245.     The CFPB Lawsuit is a possible explanation for the travails of persons like the

Plaintiffs and clearly demonstrates that Ocwen's behavior in this case is part of a larger pattern

and practice:

> "As set forth in greater detail below, Ocwen has serviced loans and collected upon
> debts based on inaccurate and incomplete borrower loan information. Ocwen has
> often input inaccurate and incomplete information, or failed to input accurate or
> complete information, about borrowers' loans into its REALServicing system of
> record. Even when the information in REALServicing has been accurate,
> REALServicing has generated inaccurate information about borrowers' loans due
> to system deficiencies. Because of these system deficiencies, Ocwen has had to
> rely upon manual processes and workarounds that have themselves resulted in
> errors in borrowers' loan information."

246.     And at Paragraph 69 of the CFPB Complaint more indication that the problems

the Plaintiffs have encountered was part of a larger pattern and practice:

> "Ocwen's use of inaccurate and incomplete information resulting from its
> boarding of inaccurate and incomplete information into REALServicing,
> REALServicing's deficiencies, and Ocwen's error-prone manual processes has
> caused or is likely to have caused borrowers substantial harm, and resulted in
> Ocwen communicating, orally and in writing, information to borrowers that it
> knew or had a reason to know was inaccurate."

247.     In addition, Ocwen has committed the same type of violations alleged herein and

detailed above against other borrowers. *See Renfroe v. Nationstar Mortg*., LLC, 822 F.3d 1241,

1247-48 (11th Cir. 2016) ("A plaintiff may establish a pattern or practice of noncompliance by

showing that the servicer has repeated the same violation against different borrowers.").

248.     On February 5, 2015, Ocwen was sued by Monette E. Saccameno in the United

States District Court for the Northern District of Illinois (Case No. 1:15-cv-01164) under similar

circumstances as set forth herein.

249.     On December 16, 2018, Ocwen was sued by Demona Freeman in the United

States District Court for the Southern District of Indiana (Case No. 1:15-cv-01164) under similar

circumstances as set forth herein.

250.     On February 18, 2019, Ocwen was sued by Roger Todd in the United States District Court for the Southern District of Indiana (Case No. 1:15-cv-01164) under similar circumstances as set forth herein.

251.     Ocwen was the only mortgage servicer in the country to utilize RealServicing.

252.     As early as 2011, Ocwen was aware of regulatory concerns expressed about problems with RealServicing through regulatory action by the New York Department of Financial Services ("NYDFS").

249.     The NYDFS conducted a series of compliance checks that resulted in two consent decrees, the second relating to Ocwen's failure to comply with its legal obligations under the original 2011 consent decree with the NYDFS.

250.     The final consent decree entered by the NYDFS occurred in December of 2014 and set forth the regulatory history between Ocwen and the NYDFS. This consent decree found that Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible. As a result, Ocwen regularly gives borrowers incorrect or outdated information and maintains inaccurate records. Finally, the regulator found that prior to its review, Ocwen did not take adequate steps to implement reforms that it was legally obligated to implement prior to the 2011 agreement.

255.     Ocwen has also been the subject of regulatory action by the CFPB and 49 States. This litigation produced a consent judgment that imposed obligations with respect to Ocwen's obligations as a mortgage servicer. Included among these obligations was Ocwen's agreement that going forward all loans exiting bankruptcy, even dismissals, would be put through a bankruptcy audit or reconciliation.

### COUNT I: Breach of Contract
### [Against US Bank]

256.     Plaintiffs incorporate by reference and restates as though fully set forth herein all previous allegations of the Complaint.

257.     The Loan, is alleged by US Bank to be an enforceable contract between it and the Plaintiffs.

258.     A true and accurate copy of the Note and Mortgage are attached hereto as "Exhibit AA".

259.     At all times herein, Ocwen acted at the direction of, and as the agent of, US Bank.

260.     US Bank is in material breach of contract for its: (i) failure to credit and apply Plaintiffs' payments as contractually obligated; (ii) assessment of unauthorized late fees, legal fees, costs, and property inspection fees; (iii) failure to dismiss the foreclosure action upon receiving notice of the facts alleged herein; and, (iv) retaining and continuing to utilize a servicer it knew was incapable of adhering to federal servicing regulations and requirements.

261.     At the time of the breach, Plaintiffs had cured and thus fully performed their obligations pursuant to the Loan by tendering payments as required.

262.     US Bank, by and through its agent Ocwen, failed to exercise due care in the servicing of the Loan and violated its fiduciary duty to Plaintiffs to handle escrow funds properly and to adjust payments to recover escrow shortage and to provide her notice of any such shortage.

263.     US Bank's actions have caused Plaintiffs concrete injury as set forth above.

## COUNT II: Violations of the RESPA
### (Against Ocwen)

264.     Plaintiffs incorporate by reference and restate as though fully set forth herein all previous allegations of Complaint.

265.    By its acts and omissions, Ocwen has numerous times and in numerous different ways violated the RESPA with respect to the Loan, including, but in no way limited to, those of which it was notified, each time it did any of the following: (i) failing to accept payments as contractually obligated; (ii) failing to provide an accurate payoff statement as required by 1026.36(c) of Reg. Z and 12 C.F.R. 1024.35(b)(6); (iv) failing to perform an escrow analysis accurately, calculate proper escrow payments, or refund an escrow surplus in violation of 12 CFR 1024.17(c) and 12 USC 2609(a); (v) improperly placing and leaving funds in suspense; (vii) failing to adequately respond to Plaintiffs' RFI No. 1 within thirty business days when it refused to provide a complete Life of Loan History.

266.    12 C.F.R. § 1024.35(a) provides that a "servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

267.    Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. §1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower."

268.    12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to a notice of error by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied

upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance."

269.    Ocwen failed to correct the identified errors or conduct a reasonable investigation.

270.    NOE No. 1, NOE No. 2, and NOE No. 3 each meet the requirements of a notice of error as defined by 12 C.F.R. § 1024.35(a).

271.    Plaintiffs has alleged by and through NOE No. 1, NOE No. 2, and NOE No. 3 that Ocwen committed dozens of separate and distinct errors pursuant to 12 C.F.R. §1024.35(b)(2) by failing to reasonably investigate identified errors, provide documentation requested, and failure to correct the multiple servicing errors raised therein.

272.    Each failure exacerbated the emotional distress caused by the previous.

273.    Ocwen's actions are a pattern and practice of behavior in conscious disregard for the Plaintiffs' rights.

### COUNT III : Violation of the FDCPA, 15 U.S.C. §1692k
### (Converse v. Ocwen)

274.    Plaintiffs incorporate by reference and restates as though fully set forth herein all previous allegations of the Complaint.

275.    Ocwen took the actions described above in an attempt to collect a debt represented by the Loan.

276.    Ocwen violated 15 U.S.C. §1692(e)(2) when they repeatedly and continuously misrepresented the character, amount, or legal status of the Loan to Converse.

277.    Ocwen violated 15 U.S.C. §1692(e)(5), going forward with the Foreclosure Case and threatening to take an action – collect upon amounts not owed following the sale of the Home - that could not legally be taken against Converse.

278.   Ocwen violated 15 U.S.C. §1692(e)(10) when they used false representations, through false Loan statements, Proof of Claims, and other deceptive means to attempt to collect upon the Loan and the Judgment it obtained prior to the First Bankruptcy Case. The falsity of these documents and statements were intentionally concealed from Plaintiffs and only discovered following an audit of the Loan in 2019.

279.   Ocwen violated 15 U.S.C. §1692f(1) by attempting to collect and collecting amounts (including interest, fees, charges, or expenses incidental to the principal obligation) that were not expressly authorized by the Loan or permitted by law in the Bankruptcy Case or Chapter 13 Discharge by:  (i) misrepresenting the amount owed; (ii) attempting to collect illegal fees and costs; (iii) misrepresenting amounts owed for escrow; (iv) declaring the loan in delinquent or default status; (v) threatening a foreclosure sale; (vi) assessing illegal foreclosure fees; and, (vii) assessing escrow overdraft charges and improper corporate advances in restatement letters and payoff letters.

280.   Ocwen violated 15 U.S.C. §1692(d) by employing an unfair and unconscionable means to collect the subject debt.

281.   Converse has been harmed by, and continue to suffer from harm resulting from the unfair and deceptive practices of Ocwen in wrongfully breaching the Loan and in making misrepresentations to further effectuate their wrongdoing.

282.   Converse  was compelled to retain counsel to send the various requests for information and notices of errors described hereinabove, and once Converse  had exercised all reasonable options at his disposal, the filing of the instant proceeding.

**COUNT IV: Violation of the Truth In Lending Act, 15 U.S.C. § 1601, et seq.
(Against US Bank)**

283.    Plaintiffs incorporate by reference and restates as though fully set forth herein all previous allegations of the Complaint.

284.    Plaintiffs assert a private right of action under 15 U.S.C. § 1640(a) for:  (i) Ocwen's breach of its duty to send interest rate and payment change notices pursuant to 15 U.S.C. § 1638a  and Reg. Z, 12 C.F.R. § 1026.20(c) and (d); (ii) Ocwen's breach of its duty to promptly credit payments pursuant to 15 U.S.C. § 1639f and Reg. Z, 12 C.F.R. § 1026.36(c)(1); and, (iii) Ocwen's breach of its duty to provide a timely payoff statement pursuant to 15 U.S.C. § 1639g and Reg. Z, 12 C.F.R. §1026.36(c)(3).

285.    Should the Court find the statute of limitation for these claims to have otherwise expired, Plaintiffs respectfully request they be equitably tolled.

### Failure to Promptly Credit Payments

286.    15 U.S.C. § 1639f (a) provides that, "[i]n connection with a consumer credit transaction secured by a consumer's principal dwelling, no servicer shall fail to credit a payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer."

287.    Ocwen has failed to credit payments (made directly and via disbursements made by the Trustee) to the Loan as of the date of receipt and its delay has resulted in charges to Plaintiffs. These failures were intentionally concealed from Plaintiffs and only discovered when the audit of their Loan was performed in 2019.

288.    12 C.F.R. §1026.36(c)(1)(ii) provides that if a servicer retains a partial payment in a suspense or unapplied funds account (rather than credits or returns it), then the servicer must (1) disclose on the periodic statement the total amount retained in such suspense or unapplied

funds account and (2) when sufficient funds accumulate to cover a full payment, promptly credit the retained funds to the oldest outstanding payment

289.   Ocwen has failed to properly disclose amounts held in suspense or, when sufficient funds accumulated to cover one of his full payments, promptly credit the retained funds to the oldest outstanding payment.

290.   The Loan was deemed current by an order of the Bankruptcy Court in the Bankruptcy Case, yet Ocwen has refused to acknowledge its misapplication of payments resulted in a manufactured state of default immediately thereafter. "[Plaintiffs has] also alleged that the amounts that [Ocwen] told her would cure her "defaults" ranged from [$3,345.95] in October of [2017] to [$7,000] as of August of [2018]. *See In re Cawood*, 577 B.R. 538 (Bankr. E.D. Tenn., Sept. 29, 2017).

### Failure to Send Payment Change and Interest Rate Notices

291.   15 U.S.C.A. § 1638b states, "During the 1-month period that ends 6 months before the date on which the interest rate in effect during the introductory period of a hybrid adjustable rate mortgage adjusts or resets to a variable interest rate or, in the case of such an adjustment or resetting that occurs within the first 6 months after consummation of such loan, at consummation, the creditor or servicer of such loan shall provide a written notice, separate and distinct from all other correspondence to the consumer, that includes the following: (1) Any index or formula used in making adjustments to or resetting the interest rate and a source of information about the index or formula; (2) an explanation of how the new interest rate and payment would be determined, including an explanation of how the index was adjusted, such as by the addition of a margin; (3) a good faith estimate based on accepted industry standards, of the creditor or servicer of the amount of the monthly payment that will apply after the date of the

adjustment or reset, and the assumptions on which this estimate is based; (4) a list of alternatives consumers may pursue before the date of adjustment or reset, and descriptions of the actions consumers must take to pursue these alternatives, including – (A) refinancing, (B) renegotiation of loan terms, (C) payment forbearances and (D) pre-foreclosure sales; (5) the names, addresses, telephone numbers, and Internet addresses of counseling agencies or programs reasonably available to the consumer that have been certified or approved and made publicly available by the Secretary of Housing and Urban Development or a State housing finance authority (as defined in section 1441a-1 of Title 12); and (6) the address, telephone number, and Internet address for the State housing finance authority (as so defined) for the State in which the consumer resides.

292.    12 C.F.R. § 1026.20(c) requires that a creditor, assignee, or servicer of an adjustable-rate mortgage shall provide consumers with disclosures, as described in this paragraph (c), in connection with the adjustment of interest rates pursuant to the loan contract that results in a corresponding adjustment to the payment.

293.    Section 1026.20(c)(1)(i) defines an adjustable rate mortgage as, "a closed-end consumer credit transaction secured by the consumer's principal dwelling in which the annual percentage rate may increase after consummation."

294.    The Home is Plaintiffs' principal dwelling.

295.    The Loan is an adjustable rate mortgage.

296.    US Bank, by and through its agent Ocwen, failed to provide Plaintiffs with notice before making changes to the interest portions of their monthly payment obligations as further described herein.

297.    US Bank's failure to provide notice caused Plaintiffs emotional distress, including but not limited to confusion, an informational injury, and deprived him of the benefit of portions of his monthly payments made in excess of what was owed to pay down his principal balance.

### COUNT V and VI: Violation of the Discharge Injunction (11 U.S.C. § 524) and FRBP § 3002.1
### (Against Ocwen)

298.    Plaintiffs incorporate by reference and restates as though fully set forth herein all previous allegations of the Complaint.

299.    Ocwen filed a Response to Notice of Final Cure Payment.

300.    The contents of Ocwen's Response to the Notice of Final Cure Payment and entry of the Order of Discharge on September 9, 2015, caused Plaintiffs to be contractually current pursuant to 11 U.S.C. § 524, Federal Rule of Bankruptcy Procedure 3002.1 and the language of her Chapter 13 Plan.

301.    Immediately thereafter, Ocwen sought to collect and continues to seek to collect pre-petition debts from Plaintiffs, and act upon a pre-petition Judgement, which pre-petition debts were paid through her Chapter 13 bankruptcy proceedings in violation of the discharge injunction. These acts were intentionally concealed from Plaintiffs and only discovered as a result of the audit performed on the Loan in 2019.

302.    Ocwen is now seeking to collect amounts for which requisite notice was not provided to the Bankruptcy Court in violation of FRBP § 3002.1.

303.    Ocwen's actions are a willful and ongoing attempt to collect a discharged debt and otherwise frustrate the purpose of the Order of Discharge.

304.    Ocwen's conduct constitutes a gross violation of the discharge injunction as it had actual knowledge that Plaintiffs was previously involved in bankruptcy, was to be deemed

contractually current, that certain fees were disallowed, and thereafter protected from any direct or indirect collection actions for discharged debts.

305.    Ocwen's actions were willful, and caused Plaintiffs concrete injury as set forth above, rendering it liable for punitive damages. *See, e.g., Romanucci & Blandin, LLC. v. Lempesis*, 2017 WL 4402643, at 6-7 (N.D. Ill. May 4, 2017); see, also, 3 William L. Norton Jr. & William L. Norton III, Norton Bankruptcy Law and Practice § 58:2 (3d ed. 2017) ("A majority of courts also allow punitive damages in appropriate cases for a violation of the discharge injunction although, unlike the statute governing violations of the automatic stay, punitive damages are not specifically mentioned in Code § 524.6").

306.    Plaintiffs allege that in order to carry out this provision of the Bankruptcy Code and maintain its integrity, vital to the protection of Chapter 13 debtors who have paid as required, this Court must permit a punitive damages instruction and impose other sanctions against Ocwen for its willful, blatant, and continued disregard for the rule of law and the authority of the United States Bankruptcy Court.

## COUNT VII: Violation of the FDCPA, 15 U.S.C. §1692k
### (Gruesser & Converse v. Ocwen)

307.    Plaintiffs incorporate by reference and restates as though fully set forth herein all previous allegations of the Complaint.

308.    The Loan was in "default" at the time MDK attempted to collect the debt by means of the Second Foreclosure Case and its various foreclosure related correspondence.

309.    Ocwen violated 15 U.S.C. § 1692(e)(2) when it misrepresented the character, amount, or legal status of the Loan in February of 2019. Specifically, Ocwen represented to Plaintiffs they owed sums which were not in fact due and included such misrepresentations in the Proof of Claim filed by their agent in February of 2019.

310.     Ocwen knew the sums it claimed to be due were in fact not, that it had repeatedly misapplied payments, that Ocwen had repeatedly misapplied payments, yet proceed to file the false Proof of Claim in February of 2019.

**COUNT VIII & IV: Violation of the Ind. Deceptive Consumer Sales Act, I.C. § 14-5-0.5, et seq.**
**(Against Ocwen)**

311.     Plaintiffs incorporate by reference and restates as though fully set forth herein all previous allegations of the Complaint.

312.     The Indiana Deceptive Consumer Sales Act ("DCSA") is a consumer protection statute designed to "protect consumers from suppliers who commit deceptive and unconscionable acts."

313.     Plaintiffs are each a consumer, the Loan and servicing of the Loan is a consumer transaction, and Ocwen is a supplier as defined by I.C. 24-5-0.5-3(A)(3), I.C. 24-5-0.5-2(a)(1), and I.C. 24-5-0.5-2(a)(1)(A)-(C).

314.     Ocwen has contractual privity with Plaintiffs as a partial assignee of the Loan or as servicing agent US Bank. It has been assigned and has agreed to undertake obligations for servicing the Loan.

315.     Ocwen has committed willful unfair and deceptive acts, both uncured and incurable, via the conduct alleged herein including but not limited to claiming amounts to be due which were not, by assessing fees and charges improperly, misapplying payments and all other conduct set forth herein.  The acts were intentionally concealed by Ocwen and only discovered by Plaintiffs following the audit of their Loan in 2019.

316.     Plaintiffs provided notice to Ocwen of its willful unfair and deceptive acts via their dispute letters, calls, correspondence via counsel, and NOE No. 1, NOE No. 2, and NOE No. 3.

317.     To the extent they were curable, Ocwen has failed to cure its willful unfair and deceptive acts despite receiving notice, as set forth above.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the entry of judgment in her favor and against Ocwen and US Bank for the following:

a.      For actual damages, including emotional distress, interest, costs and reasonable attorney fees against Ocwen for the claims made in Counts II, III, V, VI, and VIII;

b.      For actual damages, including emotional distress, interest, costs and reasonable attorney fees against US Bank for the claims made in Counts I and IV;

c.      For treble damages and attorney fees against Ocwen for the claims made in Count VIII.

d.      For statutory damages of $2,000.00 against Ocwen for each and every violation contained in Count II;

e.      For statutory damages of $1,000.00 against Ocwen for the violation set forth and contained in Count III;

f.      For statutory damages of $4,000.00 against US Bank for the violations set forth in Count IV;

g.      For punitive damages against Ocwen for the violations set forth in Counts V, VI, and the Court's inherent authority;

h.   For three times actual damages against Ocwen for the violations set forth in Count

VIII;

i.   For an Order of Contempt against Ocwen;

j.   For all other relief deemed just and proper.

## JURY DEMAND

Plaintiffs, Roderick Converse and Patricia Gruesser, by counsel, hereby respectfully demands a trial by jury on all such claims that may be so tried.

*Respectfully submitted,*

/s/ *Travis W. Cohron*
Travis W. Cohron, No. 29562-30
**CLARK QUINN MOSES SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
Fax: (317) 687-2344
tcohron@clarkquinnlaw.com

/s/ *Nicholas H. Wooten*
Nicholas H. Wooten, No. ASB-1870-o77n
**NICK WOOTEN, LLC**
5125 Burnt Pine Drive
Conway, AR 72034
Telephone: (833)-937-6389
nick@nickwooten.com

/s/*Rusty A. Payton*
Rusty A. Payton, IL Reg No. 6201771
**Payton Legal Group**
20 North Clark Street
Suite 3300
Chicago, IL 60602
Telephone: (773) 682-5210
info@payton.legal

*Counsel for the Plaintiff*